Anderson, J.
In July, 1869, Christopher "W. McLean, who is plaintiff in error, and was plaintiff' in the court below, and suedfor the benefit of ElizaW. Bissell and J. F. Barrow, obtained from the defendant a policy in the amount of fivé thousand dollars, assuring the life of Wiley F. Higgins, of Forth Carolina, for considerations and upon conditions therein expressed, for the term of the said Higgins’ life. Tins contract of assurance was made at the defendant’s agency, at Fewbern, in Forth Carolina, and was made with its agent there, T. H. Carraway.
On the 22d of March, 1870, McLean assigned the policy to his mother, Mrs. Eliza W. Bissell, all the premiums being then paid up; and on the 27th of May, 1872, Mrs. Bissell assigned it to J. F. Harrow, a resident of the city of New York, all the premiums then being paid up. Both assignments were ma.dn with the knowledge and assent of the defendant Ail the premiums were paid to the said T. H. Carraway, and the receipts, in which a clause was inserted “ not binding until countersigned by H. T. Carraway,” were signed by H. J. Hartsook, secretary, and countersigned by H. T. Carraway, agent; which establishes the agency of Carraway. After the assignment to J. F. Harrow he continued the payment of the quarterly premiums to Carraway at Fewbern, Forth Carolina. Carraway would send him a statement of the premium shortly before it was due, and he would immediately enclose him a hank check to pay it, and then Carraway would send him the company’s printed receipt for it, signed by the secretary, and countersigned by himself as agent. The last remittance Harrow made him was a bank check ti> pay the premium for July 22d, 1874. For this remittance Carraway never *365 sent him a receipt: and although he repeatedly wrote to him, he never heard from him again. In the uncertainty and distrust which tliis occasioned, he omitted to remit to Mm the premiums of October, 1874, and of January, 1875: but on the 30th of the last named month, wrote direct to 1). J. Ilartsook, secretary, at Richmond, and enclosed Mm a bank check for $75 to pay premiums, and requested him to enclose him the company’s receipts.
His letter was answered by J. J. Hopkins, assistant secretary, who informed Mm that his policy had lapsed and was cancelled because the premiums due July, 1874, had not been paid, “and (he says) must be reinstated before we can receive the premium. We enclose one of our forms of reinstatement, which you can send him (Higgins) and get him to have filled up and return to this office. If approved we will send you the receipts, otherwise return you the money. In the meantime we will place the check to your credit and subject to your order. If the policy is reinstated you can pay in future at the Hew1' York agency.”
The forms of reinstatement that he speaks of consist of a formal written application, in which the assured solemnly certifies not only as to his own health, that no circumstance has arisen since the issuance of the policy, and none now exists as to his health or habits, to make his risk less acceptable than when first assured, but also as to the health of Ms family, and that no hereditary taint or disease has exMbited itself in any member of it, besides various concessions as to liabilities and rights are required; which is to be accompanied with a medical certificate of the most searching and stringent character.
Mr. Harrow made no reply to this communication, and did not avail himself of the forms of reinstatement, if they were sent him, but waited in silence until the new quarterly premium would be soon due, and then, July *366 1st, 1875, enclosed to him a bank check for fifty dollars 1° pay premiums. The check was returned by Hopkins with a reiteration that the policy was cancelled, and that y. may reinstated by payment of back premiums and medical examination,
Mr. Harrow then sent his attorney, Mr. YanCott, of Yew York, to Richmond, to have an explanation, and if he could, an adjustment of the difficulty. Mr. YanCott testifies, that on being introduced to Mr. Hopkins he stated the nature of his business; that he had been sent there to adjust some differences which seemed to exist between Mr. Harrow and the Piedmont -and Arlington Company. “ The company claimed that Higgins’ policy had lapsed in July, 1874, and Harrow claimed that it had not. He says I produced a check with the endorsements thereon (which he gives and which are inserted in his deposition,) showing that the July, 1874, premium had been paid, but that Mr. Harrow had no receipt for the payment except the endorsement of Carraway on the check. This (he says) was very satisfactory to Mr. Hopkins, and he said it was all right. After a few minutes he said the policy had lapsed in October, 1874. I told him that Mr. Harrow had made every effort he could to find Carraway, and showed him copies of letters sent, being the same letters that are set out in the testimony of Harrow, and that after Mr. Harrow found that he could not find Carraway, he sent his check for $75 to the company, and they still had the money. He then told Mr. Hill to make up a statement; Hill did so, and we found that Harrow had paid up to July, 1875, and over and above; that there was a balance of three dollars and some cents to Barrow’s credit. Mr. Hopkins then said that if the policy had lapsed he was satisfied that it was not the fault of Harrow* and that Harrow had acted in perfect good faith in the matter. And Hopkins then and there agreed with me that *367 tlie policy should he reinstated or continued in force the same as if nothing had happened, as he was satisfied of Harrow’s good faith in the matter. Nothing was said about Mr. Higgins’health while I was there. * * Hopkins seemed perfectly surprised when I showed him the check that had been paid' to Oarraway, and which Carraway had failed to pay over to the company, and said that explained the whole matter. He said further that the company had had trouble with Oarraway before, and had sued him in another matter, and was going to sue him.
“ Mr. Hopkins said he was satisfied the company had made a mistake, and that the policy had not lapsed in July. The company had claimed all along that the policy had lapsed in July (that is the ground assumed by Mr. Hopkins in his letter of February 1st, 1875), and the idea that it had ever lapsed in October was never mentioned until after I had shown Hopkins that it had not lapsed in July. 13ut after the clerk made out a statement showing that Harrow’s $75, paid up to July 22d, 1875, and after assuring Mr. Hopkins that Harrow had been acting in the utmost good faith in everything that he had done, without any hesitation he said he would waive their rights, or waive the lapse, and reinstate the policy as it had formerly been, or words to that effect.”
Upon the case as now stated two questions arise:
First. Was the policy forfeited under the circumstances by the non-payment of premiums ?
Second. If forfeited, has the forfeiture been waived ?
Hpon the first, has there been default in the non-payment of premiums by Harrow ? Where and to -whom was he to pay the premiums ? The contract was made in Newbern, North Carolina, where the company had an agency. It was a North Carolina contract; and it would seem that the obligation, and consequently the right, was to pay there, as was held in Manhattan Life Ins. Co. v. *368 Warwick, 20 Gratt. 614, as to contracts made in Virginia, that they were payable in Virginia. And to whom were the premiums payable but to the recognized agent of the company, Carraway, at Newbern. To him, and there, the payments were made by McLean, and by his assignee, Mrs. Bissell, and by her assignee, Mr. Barrow, up to July, 1874, with the approval of the company. To him Mr. Barrow made a remittance of the premium which was due in July, 1874, which he received, but did not pay over- to the company. The company up to the 15th of July, 1875, were not aware of that payment, and believing that Barrow had been in default, cancelled the policy on its books; and its organ, the assistant secretary, tells Mr. Barrow as late as February 1st, 1875, that the policy has lapsed because of the non-payment of that premium, and that no premiums can be received on it until it is reinstated. If Barrow was under obligation to pay the premiums to the North Carolina agent, in North Carolina, it was not lawful for him to pay anywhere else without the permission of the company. Both parties seem to have so understood it; for Barrow, wishing to make his future payments at the New York agency, deemed it necessary first to get the permission of the company, and the 'company gave him permission. Well, if it was the light and the duty of Barrow to pay the premiums to the North Carolina agent, at Newbern, he knew of no other agent there than the one to whom he, and those before him, had paid every premium that had fallen due, with the approval of the company: namely, B. T. Carraway. But after the last payment he had made to him, he had good grounds for distrust whether it would be safe for him, or the company, that he should make further remittances to him until he heard from him and the cause of doubt and distrust had been removed. But he had no knowledge of his removal from his agency. Tie had no *369 knowledge of any other agent of the companv in hTorth Carolina, where payment had to be made. He had never been notified by the company of the removal of Carraway, and of another agent being substituted in his place, to whom his premium could be paid. He was in another state, at a great distance from the Horth Carolina agency, and knew nothing of what was going on there. He still regarded Carraway as the agent of the company to whom Ms payments had to be made. But as he had not sent him a receipt for the premium of July, and had not sent him a statement, as he was wont, of the next premium that was due in October, although he had written to Mm for it; and as he could not get a line from him in reply to his repeated and earnest letters, as a prudent man he did not think it proper to make a remittance of money to him; and finally, after the January premium was past due and he had heard nothing of Carraway, he determined to communicate direct with the secretary of the company, at its chief office, though in a different state from that where the contract was made and the premiums were payable, and remitted to him a check for $75 to dispose of, so as to satisfy the premiums to the company and to protect Mm.
But if it should be said he ought to have done it sooner, it is at least doubtful whether the obligation was on him to do it at all; and whether it was not the duty of the company, when they removed their agent, to have notified him of it, and to have informed him to whom he should make payment thereafter. If that had been done, there never would have been any difficulty. Bor it is perfectly manifest upon the face of the record, that Barrow was always prepared and anxious to pay his premiums according to the requirements of his contract. And if he had ever failed to come up to the exact requirement, it was because he was lead into error by the *370 agent of the company, upon whom he relied for information and direction as to the requirements of the contract.
But there is no question as to the regularity of those paymen^s. they are all admitted; and Barrow was in no ™ payment of the July premium. But the company had determed otherwise, and had cancelled his policy on that account. If he had remitted to J. J. Hopkins at Bichmond. he would not have received it. For as late as the 1st of February, 1875, he refused to receive any premium upon the ground that the policy had been «cancelled for the non-payment of the July premium. And if he had remitted the January, 1875, premium, it would have been the same. As long then as the company assumed that position, there would have been no use in remitting any of the premiums subsequent to July to the chief office of the company at Bichmond. It is true that the company has changed its views. It admits its mistake. It admits that the July premium was paid to their agent, and is lost to the company, unless it can he made out of Carraway. But it • did not come to this ■conclusion until long after the January premium was past due; ’ not in fact until the 15th of July, 1875.
But suppose he had remitted the October and the January premiums to Carraway, of whose removal from the agency he was not informed. His obligation, as we have seen, was to pay to the North Carolina agent, and he was not informed that there was any other. And it .just occurs to me that the company itself has shown that it regarded Newbern as the place where, and Carraway the agent to whom, the payments were to be made, by an incident disclosed in the record. A remittance of the premium was made by Barrow, by mistake, to the office at Bichmond, and the company there, instead of retaining it and sending him a receipt for it, forwarded it to Newbern, N. C., and he received a receipt for it *371 in proper form from Carraway. And suppose he had remitted the premiums of October and January following to Carraway, not knowing that he was not still the agent, it would have been the loss of the company, or his own loss—probably the former, as they have con■ceded as to the July premium. It would certainly have been no advantage to the company. It was necessary that the company should have had an agent at Eewbern authorized to receive the premiums before the assured could be held to a default for their non-payment. And it would seem that their known agent, to whom payment of the premiums had been uniformly made, from the time of the issuance of tire policy, having been removed .and another substituted in his place, it was the duty of the company to have notified Harrow, who lived in a distant state, and could not be presumed to have known of the change and to whom he should thereafter make payment. Upon a contract to pay on a ceitain day, upon condition of a forfeiture for default, if the payer is prevented by the act or non-action of the party who is to receive payment from making the payment ad diem, or if the payer incapacitates himself to receive, or the other party to pay, the forfeiture fails.
But whether it ivas a forfeiture, depended upon the facts; and whether the facts were proved which would •establish a forfeiture, was a question for the jury. 'Without now deciding that question, we are of opinion that it would have been proper for the court to have instructed the jury that if they believed from the evidence that the facts were so and so, it was a forfeiture; and if they Believed them to be thus and so, it was not a forfeiture. But to instruct them that upon the facts proved the .assured had forfeited his policy, was to decide the facts of the case and to invade the province of the jury. For this reason we are of opinion that the first instruction *372 given by the court, and all the instructions given, which were consequential upon it, were erroneous and ought not to have been given.
If Harrow had been in such default as would entitle the company to insist on a forfeiture, has it waived that right, and is it estopped now to assert it ?
It seems to be well settled that it is a right which the company may waive. The doctrines on this subject are clearly stated in a well considered opinion by Judge Burks in Georgia Home Ins. Co. v. Kinnier’s adm’x, recently decided by this court. 28 Gratt. 88. In that case the court held that conditions in a policy, which are for the benefit of the insurer, and the breach of which is visited with forfeiture, may be waived, by the insurer or his lawful agent. And numerous authorities are cited in the opinion in support of the decision, which are here referred to. The Chicago Life Ins. Co. v. Anna M. Warner, 70 Illi. R. 410, clearly maintains the same doctrine. The decision of this court in the more recent case of Southern Mutual Ins. Co. v. Yates, maintains the same principle. 28 Gratt. 585. Judge Staples, who delivered the opinion, says (p. 597), “if the defendant, with knowledge of the existence of the incumbrance, knowingly received assessments upon the note involved in the controversy, such conduct -would amount to a waiver of the breach of warranty, whether so intended or not.” Here it is held that even a breach of warranty may be waived by the acts of the warrantee. The waiver may be made either by the conduct and acts of the party for whose benefit the condition or warranty is made, or by agreement express or implied.
In the case under judgment there is proof tending to show' an express agreement by the defendant to waive the right to avoid the policy, because of the non-payment ud diem of the quarterly premiums, due 22d of October, *373 1874, and 22d of January, 1875, and that the policy should continue in force as if nothing had happened. "Whether there had been such a waiver was a question of faót for the jury. And the court ought to have instructed the jury that if they believed from the evidence that Darrow had failed to pay the quarterly premiums ad diem on the 22d of October, 1874, and the 22d of January, 1875, when they respectively fell due, and that by reason thereof he had forfeited Ms right to the policy, but further believed from the evidence -that the defendant had waived, or agreed to waive its right to the forfeiture, and received the back premiums from the assured or Darrow, which were paid on the faith of the waiver, they should find for the plaintiff.
But instead of giving such instruction, the court instructed the jury as follows: “That the printed receipts for the payment of premiums over due, delivered by the assistant secretary to the plaintiff’s attorney in July, 1875, and exhibited by the plaintiff to the jury, are evidence which cannot be contradicted or varied by parol testimony, of the contract upon which the -defendants agreed to reinstate the policy.” It is not to be doubted that cotemporaneous parol evidence is inadmissible to vary or contradict the terms, or the legal import of a valid written contract, unless in the case of fraud, accident or mistake. Towner v. Lucas’ ex’or, 13 Gratt. 705. But that is not tiffs case. The parol evidence was introduced for no such purpose; but to prove that the defendants’ agent had waived any right he had to a forfeiture, not considering that the company was entitled to it when the facts of the case Avere understood by him, and that it would be unjust to Darrow, who he said was not to blame, but who had acted in good faith, and agreed to receive the money Avhich had been previously remitted to him in payment of the back premiums, and *374 that the policy should continue in force as if nothing had happened; that he would waive the lapse and reinstate* the policy as it had formerly been. In a short time the-receipts were prepared and handed by Mr. Hopkins to Mr. Harrow’s agent, saying that now everything was all right. They were not read to the agent, and were not read by him. He received them as the company’s receipts for the back premiums, and did not know, hadn’t a thought that they were anything else but receipts for the money paid, or constituted a contract, or any evidence of a contract, and of a contract by which Mr. Harrow was bound to guarantee the present good health of Higgins in very stringent terms. Ho such contract had been made between them, nor intimation by Hopkins that such terms-would be required. Hothing had been said as to the health of Higgins, but upon being put in possession of" the facts of the case, which he had not known before, he thought it would be unjust to Harrow to insist upon a forfeiture, and agreed to waive it. This is substantially the plaintiff’s testimony. Mr. Hopkins knew that Harrow was unwilling to make application to have the policy reinstated upon the terms provided by the policy for reinstating lapsed legacies; for he had sent him, before he himself was informed of the facts, the forms for its reinstatement, which Harrow would not have executed, but remitted him money to pay the next premium before it was due; by which he had reason to know that he did not regard his policy as lapsed, and was not willing to have it reinstated on the terms which he, Hopkins, proposed; and after the explanation he received from Mr. Harrow’s agent he himself was satisfied, and so expressed himself that the company had made a mistake in cancelling the policy on its hooks as a lapsed policy for the non-payment of the premium of July, 1874 ; and upon the whole case-,, as he then understood it, was satisfied that the policy *375 should continue in force just as if nothing had happened, and so expressed himself to Harrow's agent, without intimating that he would still insist upon a medical examination of Higgins, as he had done before he was informed of the facts; but agreed to receive payment of the premiums, which before this he had refused to do without a medical examination, and directed the receipts to be filled up.
Each of the five receipts contained the clause guaranteeing the health of Higgins—the receipt for the premium due in July, 1874, as well as the others—although he admitted, and now admits, that that premium had been paid in due time, and that there was no default in its payment which should cause a lapse of the policy. If the receipt with the objectional clause was given for that premium for the reason, which he assigns, that he had no printed receipts in hand which did not contain that clause, for the same reason he had to use them in the other cases. The receipts thus handed to Mr. VanCott, he handed in a bundle, which had been unopened and never examined by him, to Mr. Harrow, telling Mm that the whole matter had been most satisfactorily adjusted, and there were Ms receipts. And Mr. Darrow testifies that he received them as receipts, and never opened them or examined them until he received a receipt for the next premium, in which he found the objectionable clause. The others were then examined by him and Mr. VanCott, and to their great surprise, they found the same objectionable clause in each of them; and Mr. Hopkins was informed that they never made any such contract, and would not be bound by it.
How, the question is, Hid Mr. Harrow ever make such a contract ? Do the receipts evidence any contract made by Mm? He never signed them. The only ground upon which it could be claimed to be his contract, is, that the receipt was delivered to his agent, and his receiv *376 ing it would imply that he approved of it. But how could this implication be made, if it was delivered to him merely as a receipt for the money he had paid, and he never read it, nor was it read to Mm; and he was not told that it contained iu addition to the receipt, a clause evidencing a contract, and when he knew he had made no contract and no contract had been proposed; but what had previously passed between Mm and the company’s agent was calculated to impress on his mind that they were merely receipts, and nothing had passed that would suggest to his mind that the papers handed to him as receipts might contain a clause evidencing a contract between the defendant and his principal ?
If this evidence is to be believed (there is conflicting evidence, and it was a question for the jury, and the court does not intend to intimate an opinion on that point,) it would be a gross fraud upon Darrow to set up these receipts as evidence of a contract between him and the defendant. And the authorities uniformly hold that parol evidence is not inadmissible to contradict the terms of a written contract, where there is fraud. It is only inadmissible to contradict or vary the terms of a valid contract. But in this case it is not offered to contradict or vary the terms of the written contract of the party who offers it, hut to show by independent facts, dehors the instrument, that it is not his contract. Insurance Company v. Mahone, 21 Wall. U. S. R. 152, is a case in point, and fully sup« ports this position. Mr. Justice Strong, speaking for the whole court, says: “The testimony was admitted, not to contradict the written warranty, but to show that it was not the warranty of Dillard, though signed by him.” There the instrument was signed by the party; here it was not. This case is stronger than that in favor of the admission of parol testimony. Insurance Company v. *377 Wilkinson, 13 Wall. U. S. R. 222, is also a strong ease in point.
Towner v. Lucas' ex'or, supra, does not militate against the admissibility of the parol evidence in this case, but is authority for it. Allen, J., says, p. 715: “I can find no ease which determines that oral cotemporaneous evidence is admissible to contradict the terms of a written agreement, or substantially vary the legal import thereof, provided the instrument was a valid instrument and the party designed to execute it in its existing form. The fraud which will let in such proof must be fraud in the procurement of the instrument, which goes to its validity, or some breach of confidence in using a paper delivered for one purpose and fraudulently perverting it to •another. In such cases the oral evidence tends to prove independent facts which, if established, avoid the effect of the written agreement by facts dehors the instrument, but do not tend to contradict or vary it.” The doctrine thus so clearly enunciated by that able jurist, covers this case. It could not be more appropriate if it had been written expressly for it. In The Southern Mutual Ins. Co. v. Yates, supra, there was no fraud, or imputation of fraud, or of any breach of confidence in using a paper delivered for one purpose and fraudulently using it for another.
Upon the whole, the court is of opinion to reverse the judgment of the circuit court, and to remand the cause for further proceedings to be had therein in conformity with this opinion.
Staples, J.
I do not concur with Judge Anderson in the opinion that the policy was not forfeited by the failure to pay the premiums. I think the judge of the circuit court did not err in his instruction upon this point. In my opinion there was no sufficient evidence in the case to *378 justify even the submission of the question to the jury whether the policy was or was not forfeited.
I do concur, however, in that portion of the opinion relating to the waiver of the forfeiture. If the,plaintiff’s version of the transaction be correct, and there was an unconditional waiver of the forfeiture upon sufficient consideration and under the circumstances described, it was a fraud upon the plaintiff to insert in the receipts a conditional waiver. Upon this point the evidence was very conflicting. The plaintiff had the right to have the whole question submitted to the jury. I think, therefore, the judge of the circuit court erred in'not so instructing the jury.